IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Criminal No. 7:21-cr-00003 |
| v. | ) | |
| | ) | By:  Elizabeth K. Dillon |
| DEREK JAMAR HEWITT | ) | United States District Judge |

**MEMORANDUM OPINION AND ORDER**

Derek Jamar Hewitt is charged with possession with intent to distribute marijuana (Count 2), use of a firearm in connection with a drug trafficking crime (Count 3), and stealing marijuana from a package as a postal service employee (Count 1).  Hewitt moves to suppress evidence seized pursuant to a warrantless search of Hewitt's room at the Extended Stay hotel in Roanoke, and all evidence flowing therefrom.  (Dkt. No. 29 – this was an amended motion filed to correct a similar motion filed on the same day.)  In the briefing and at the hearing, no argument was made that the evidence found at the Extended Stay hotel had any connection to the evidence supporting the charge set forth in Count 1 of the Indictment.  After the hearing, Hewitt filed a supplemental motion to suppress evidence regarding Count 1.  (Dkt. No. 37.)  The court will not address the supplemental motion in this opinion and order and will treat the supplemental motion as a second motion to suppress.  For the reasons stated below, Hewitt's initial motion to suppress will be granted.

I.  BACKGROUND

In the late evening and early morning of March 11–12, 2020, three 911 calls were placed in quick succession about the occupant of room 322 at the Extended Stay.  The first call, at 11:26 p.m., reported that a person on the third floor was smoking "weed" and laughing in the hallway.  (Def. Ex. A - all exhibits are referenced in the Hearing Exhibit List, Dkt, No. 36.)  Two officers

from the Roanoke City Police Department responded, saw no evidence of any suspicious activity, and left. (*Id.*) The second time, at 1:06 a.m., the caller identified the room at issue, room 322, and reported that people inside the room were banging on the wall and yelling. (Def. Ex. B.) The same two officers responded again and found that the room was quiet. (*Id.*)

The third time, at 1:43 a.m., the caller again identified room 322, this time saying that the person, who she described as a short black man wearing a black jacket, white shirt, and blue jeans, told her to mind her own business and that he was selling drugs from his room. (Def. Ex. C.) She also said that the man flashed a gun at her at 3 p.m. the previous day, March 11. (*Id.*) All three calls came from the same number, and each time the caller indicated that she did not want to talk to the police and did not want to be identified. The incident type on the first two calls is noted as nuisance, and the third call is noted as a drug incident.

Officer Anthony Garcia, along with the officers who responded to the first two calls, arrived on the scene and went to room 322. There is no evidence that they heard anything, smelled anything, or saw anyone outside the room. There was a gap between the door and the door frame, and there was light coming from the door. Officer Garcia, however, could not see in the room, and it was dark. He knocked on the door and received no answer. He then knocked louder. At this point, he, admittedly, had no probable cause for a search warrant. Officer Garcia then kicked, or pushed, the door with his foot twice. According to his testimony, he did this to make sure no one was inside hiding or to see if someone had been shot or had overdosed. He could not see anything after the first kick despite shining his flashlight in the room. He did not see or hear anyone. Then, he kicked the door open more, and the officers announced themselves as they went in the room. They did not find anyone, but they saw what appeared to be marijuana

and a firearm on the bed. A search warrant followed. The body camera footage is consistent with the above facts. (Gov't Ex. 1.)

After securing a search warrant, officers found a bucket containing marijuana, several packages containing marijuana, a handgun, $560 in cash, various cannabis edibles, three containers of cannabis wax, vape pens, a black iphone, and a receipt with defendant's name on it.

## II. ANALYSIS

Defendant argues that the officers conducted a warrantless search when they pushed open the hotel room door to view its interior and that the warrantless search did not fall under any exception to the Fourth Amendment. Since the warrantless search became the basis for the more extensive search pursuant to the warrant, defendant argues that both searches violate the Fourth Amendment.

**A. Community Caretaker Exception to Fourth Amendment Warrant Requirement**

Under the Fourth Amendment, defendant had a legitimate expectation of privacy in his rented hotel room. *See Stoner v. California*, 376 U.S. 483, 490 (1964); *United States v. Kitchens*, 114 F.3d 29, 31 (4th Cir. 1997). Additionally, warrantless searches are presumptively unreasonable unless the search falls within a valid exception. *See Hupp v. Cook*, 931 F.3d 307, 326 (4th Cir. 2019) (citing *Payton v. New York*, 445 U.S. 573, 586 (1980)).

The government cites the so-called "community caretaker" exception as justification for the officers dispensing with the warrant requirement in entering the hotel room. Community caretaking functions include established procedures or routine activities such as impoundment of a vehicle that impedes the safe flow of traffic, entry into a car after a traffic accident to assess occupants' medical conditions, or opening a truck compartment to identify the owner. *See South Dakota v. Opperman*, 428 U.S. 364, 368–69 (1976); *United States v. Johnson*, 410 F.3d 137, 145

(4th Cir. 2005); *Durney v. Doss*, 106 F. App'x 166, 169 (4th Cir. 2004). The Fourth Circuit has held that the community caretaking doctrine also extends to activities "protecting the safety of persons or property." *United States v. Gillespie*, 332 F. Supp. 2d 923, 929 (W.D. Va. 2004); *see Phillips v. Peddle*, 7 F. App'x 175, 178 (4th Cir. 2001). Courts have distinguished this doctrine from the separate, but related, exception justified by exigent or emergency circumstances. *See, e.g.*, *Hunsberger v. Wood*, 570 F.3d 546, 554 (4th Cir. 2009) ("The community caretaking doctrine requires a court to look at the function performed by a police officer, while the emergency exception requires an analysis of the circumstances to determine whether an emergency requiring immediate action existed. Thus, as the district court noted, the doctrines have different intellectual underpinnings.").

The community caretaker exception has most often been used to justify searches of automobiles, *see Phillips*, 7 F. App'x at 178; *Gillespie*, 332 F. Supp. 2d at 929, and a recent Supreme Court ruling calls into question the validity of the exception outside of this context. *See Caniglia v. Strom*, 141 S. Ct. 1596 (2021). In *Caniglia*, the Court explained that its ruling in *Cady v. Dombrowski*, 413 U.S. 433 (1973), that a warrantless search of an impounded vehicle for an unsecured firearm did not violate the Fourth Amendment, did not create a "standalone doctrine that justifies warrantless searches and seizures in the home." 141 S. Ct. at 1598. In *Cady*, the Court observed that police officers who patrol the public highways are often called to discharge noncriminal "community caretaking functions" such as responding to disabled vehicles or investigating accidents. 413 U.S. at 441. *Cady*'s "unmistakable distinction between vehicles and homes" places "into proper context its reference to 'community caretaking.'" 141 S. Ct. at 1599. "What is reasonable for vehicles is different from what is reasonable for homes. *Cady* acknowledged as much, and this Court has repeatedly 'declined to expand the scope of . . .

4

exceptions to the warrant requirement to permit warrantless entry into the home.'" *Id.* at 1600 (quoting *Collins v. Virginia*, 138 S. Ct. 1663, 1672 (2018)).

Though *Caniglia* was a unanimous opinion, three separate concurring opinions highlighted various scenarios where officers may enter a home without a warrant. *See, e.g*, *Caniglia*, 141 S. Ct. at 1600 ("A warrant to enter a home is not required . . . when there is a 'need to assist persons who are seriously injured or threatened with such injury.'") (Roberts, C.J., concurring); *id.* at 1601 (discussing cases "involving warrantless, nonconsensual searches of a home for the purpose of ascertaining whether a resident is in urgent need of medical attention and cannot summon help") (Alito, J., concurring); *id.* at 1604 (explaining that "the Court's exigency precedents . . . permit warrantless entries when police officers have an objectively reasonable basis to believe that there is a current, ongoing crisis for which it is reasonable to act now") (Kavanaugh, J., concurring). Thus, it may be that the community caretaker exception survives *Caniglia* in some form. *But see id.* at 1600 (stating that *Cady* "did not recognize any such 'freestanding' Fourth Amendment category. The opinion merely used the phrase 'community caretaking' in passing") (Alito, J., concurring). Even if something akin to the community caretaker exception exists after *Caniglia*, or the government is proceeding under some other, similar exception, defendant's motion to suppress will be granted because the search does not meet the community caretaker exception or any other exception to the warrant requirement.

Here, we have reports of people smoking "weed" and laughing near the hall and people in a certain room being loud and hitting the wall. Investigation revealed nothing to support these reports. Then, we have a report of a person, with a description, in a certain room, who flashed a gun at the caller, told her to mind her own business, and told her he was selling drugs out of the

5

room. In the same call, the caller says the flashing of the gun occurred at 3:00 p.m. the previous day. There is no indication when the conversation between the two occurred. The first two calls revealed possible recent marijuana use and noise. The investigation revealed no persons, no marijuana, no odor of marijuana, and no noise. In other words, the information from the caller was completely unsubstantiated. The last call revealed the viewing of a firearm about ten hours before the call, and a statement about drug sales and minding one's own business at some unknown time. Prior to entry into the room, investigation revealed, again, no persons, no marijuana, no odor of marijuana, no noise, no drugs, and no firearm. At no time was there any information that anyone was observed under the influence of substances, selling drugs, or in any type of danger. The only possible danger would have been the flashing of a weapon ten hours before the call. There was no information that property or persons in the hotel room were in distress or in need of protection or that any emergency at all existed.

Attempting to justify entry into the room and with no support in case law, the United States contends that the mention of drugs in the anonymous 911 call justifies a warrantless entry. It notes that drug overdoses are a legitimate problem in the country, and in this community, and that Officer Garcia often finds victims of drug overdoses. Overdoses are a significant problem, to be sure, but concern about an overdose[1] in this situation, without more information, was purely speculative. To allow a warrantless entry under these circumstances would gut the protections provided by the Fourth Amendment.

The government also argues that the officers were justified in entering defendant's hotel room because it was their third response to the location. The officers were trying to diffuse a situation where a 911 caller was repeatedly asking for resolution of a disturbance, offering

---

[1] The court further notes that the only drug mentioned with specificity was marijuana. Officer Garcia did not testify that he often finds victims of marijuana overdoses.

varying accounts and conflicting information that could not be verified after multiple trips to the scene. The officers were skeptical of the 911 reports, but also did not want to return a fourth time, so they were determined to resolve the situation to the satisfaction of all involved. Essentially, the government argues that the officers should have been allowed to enter the room because: 1) they have limited resources and are busy; and 2) they and the public have an interest in resolving matters efficiently. The government suggests that the subjective intent of Officer Garcia and the other responding officers was not to investigate crime, but to resolve a complaint under the rubric of community caretaking. However, the Supreme Court has held, and the government conceded at the hearing, that an officer's subjective motives in entering a home without a warrant are not relevant under the Fourth Amendment analysis. *Brigham City, Utah v. Stuart*, 547 U.S. 398, 404 (2006) ("An action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, as long as the circumstances, viewed objectively, justify the action. The officer's subjective motivation is irrelevant."). Here, under the circumstances and on a call mentioning the sale of drugs and a firearm, it cannot be said that entry into the room was divorced from a criminal investigation. Moreover, there is no exception to the Fourth Amendment's warrant requirement for inconvenience or efficient use of police resources.

In its briefing, the government likens this situation to a Sixth Circuit case that applied the community caretaker exception to a warrantless entry in response to a noise complaint. *See United States v. Rohrig*, 98 F.3d 1506 (6th Cir. 1996). As officers approached the house, they heard loud music. One of the officers loudly banged on the front door, while the other officers walked around the residence, tapping the windows. After failing to get the attention of anyone inside, the officers opened an unlocked screen door, passed through a porch, an open back door,

into the kitchen, then into the basement in search of someone to turn the music down. In the basement, the officers discovered "wall to wall" marijuana. The court found that there were no exigent circumstances, but a "compelling governmental interest" which supported a warrantless entry because adhering to the warrant requirement would "subject the community to a continuing and noxious disturbance for an extended period of time without serving any apparent purpose." 98 F.3d at 1522. The holding in this case is questionable after the ruling in *Caniglia*. Notably, the government seemed to back away from the community caretaker exception at the motions hearing, as *Caniglia* was issued in the interim period between the close of briefing and the hearing. But even comparing this case to *Rohrig* on its own terms, there was no active nuisance when the officers arrived at defendant's room.

**B. Fruit of the Poisonous Tree**

As noted above, defendant seeks to exclude not only evidence seized during the warrantless search, but also evidence that was seized pursuant to the warrant that the officers obtained using information obtained from the illegal, warrantless search. Under the fruit of the poisonous tree doctrine, "defendants may seek to suppress not only evidence obtained as a direct result of an illegal search but also evidence later discovered as a result of that search." *United States v. Terry*, 909 F.3d 716, 720 (4th Cir. 2018). The doctrine clearly applies in the instant case. Evidence obtained by police pursuant to the warrant will also be excluded.

**C. Good Faith Exception**

At the hearing, the government referenced the good faith exception to the exclusionary rule. *See United States v. Leon*, 468 U.S. 897 (1984). Under the good faith exception, "evidence will not be suppressed if it is obtained by police officers in objectively reasonable reliance *on a search warrant*, even if the warrant later is determined to be invalid." *United States v. Blakeney*,

949 F.3d 851, 861 (4th Cir. 2020) (citing *Leon*, 468 U.S. at 922–23) (emphasis added). Thus, many courts have held that the good faith exception does not apply in a case where officers did not obtain a warrant. *See Zelarno v. Taylor*, C.A. No. 7:09-cv-02860-JMC, 2011 WL 3794143, at *5 (D.S.C. Aug. 24, 2011) ("Although, there are some circumstances in which courts have applied the good faith exception to warrantless searches, a number of circuit courts have declined to apply the good-faith exception to warrantless searches.") (collecting cases). As one court explained, the "underlying purpose of the exclusionary rule, to deter police misconduct, is not applicable when it is the judiciary that is in error in issuing the warrant and not the officer executing it. *Leon* is simply misplaced in the instant matter. The holding in *Leon* does not modify the exclusionary rule in cases in which the police have acted without a warrant." *United States v. Boffman*, 747 F. Supp. 1251, 1254 (S.D. Ohio 1990).

Even if the good faith exception could apply in this situation, the government provides no argument for the court to analyze how the officers' actions meet the standards of *Leon*. *See, e.g.*, *United States v. Williams*, 548 F.3d 311, 317–18 (4th Cir. 2008) (setting forth the four circumstances where an officers' reliance on a warrant would not qualify as "objectively reasonable").[2] Therefore, the court will not apply the good faith exception to the exclusionary rule.[3]

---

[2] These include where the judge issuing the warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth, where the magistrate judge acted as a rubber stamp for the officers and so wholly abandoned his detached and neutral judicial role, where a supporting affidavit is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable, and where a warrant is so facially deficient, i.e., in failing to particularize the place to be searched or the things to be seized, that the executing officers cannot reasonably presume it to be valid. *Williams*, 548 F.3d at 317–18.

[3] The government does not argue that the results of the second search, the search that *was* conducted pursuant to a warrant, can be saved by the good faith exception. *See United States v. Massi*, 761 F.3d 512, 528 (5th Cir. 2014) (discussing the interaction of the doctrine of fruit of the poisonous tree with *Leon*'s good faith exception).

## III. CONCLUSION

For the foregoing reasons, it is HEREBY ORDERED that defendant's motion to suppress (Dkt. No. 29) is GRANTED with the understanding that this opinion and order does not address the issues raised in defendant's second motion to suppress (Dkt. No. 37).

Entered: June 14, 2021.

/s/ *Elizabeth K. Dillon*
Elizabeth K. Dillon
United States District Judge